182 So. 485

## BOARD OF BARBER EXAMINERS OF LOUISIANA v. PARKER.

### No. 34517.

March 7, 1938.

On Rehearing May 30, 1938.

Gaston L. Porterie, Atty. Gen., and George M. Wallace, Richard A. Dowling, R. F. Walker, Joe T. Cawthorn, and A. F. Rabun, Sp. Assts. to Atty. Gen., for plaintiff.

Guy H. Holloway, of Farmerville, and Charles H. Morton, of Bernice, for defendant.

ODOM, Justice.

This appeal presents for our consideration the sole question of whether Section 12, Act No. 48 of 1936, is constitutional.

The Act involved is, according to its title, one:

"To regulate and control the Barber Industry, and for that purpose to further enlarge the present powers of the Board of Barber Examiners; defining its additional jurisdiction, powers, and duties; to approve agreements from each Judicial District; and providing penalties for violation of this Act."

The Board of Barber Examiners .was created by Act No. 247 of 1928. Section 12 of the Act of 1936 provides:

"That the Board shall have the power to approve price agreements establishing minimum prices for barber work, signed, and submitted by any organized groups of at least 75% of the barbers of each Judicial District, after ascertaining by such investigations, and proofs as the condition permits and requires, that such price agreement is just, and under varying conditions, will best protect the public health and safety by affording a sufficient minimum price for barber work to enable the barbers to furnish modern and healthful services and appliances, so as to minimize the danger to the public health incident to such work."

That Section of the Act further provides that the "Board shall take into consideration all conditions affecting the barber profession in its relation to the public health and safety".

The same section further provides that:

"In determining reasonable minimum prices, the Board shall take into consideration the necessary costs incurred in the

particular Judicial District in maintaining a barber shop in a clean, healthful and sanitary condition."

As to the fixing of minimum prices which barbers are required to charge for their services, the same Section of the Act provides that:

"The Board, after making such investigation, shall fix by official order, the minimum price for all work usually performed in a barber shop."

By Section 4 of the Act, the Board of Barber Examiners is declared to be the instrumentality of the state for the purpose of attaining the ends sought to be accomplished by the legislation.

Section 8 of the Act provides that the Board may institute such judicial proceedings ·as may appear necessary to enforce compliance with any of the provisions of the Act, or compliance with any rule or order made by the Board pursuant to the requirements of the Act, and

" * * * in addition to any other remedy may apply to any District Court of competent jurisdiction for relief by injunction."

In addition to the civil proceedings authorized by Section 8 of this Act, the same section declares:

"That a violation of any provision of this Act or of any rule, subpoena or order of the Board lawfully made pursuant hereto, except as otherwise expressly provided by this Act, shall be a misdemeanor punishable by a fine not less than Twenty-five ($25.00) Dollars and not exceeding Three Hundred ($300.00) Dollars, or by imprisonment not exceeding six months, or both, and each day during which such violation shall continue shall be deemed a separate violation."

A group of the prescribed percentage of barbers in the Third Judicial District, composed of the parishes of Lincoln and Union, signed and submitted to the Board of Barber Examiners an agreement establishing minimum prices for barber work in that Judicial District. The agreement was approved by the Board.

The defendant is a licensed barber, holding a certificate issued to him by the Board of Barber Examiners, and is registered. He owns and operates a barber shop in the Village of Bernice, in the Parish of Union, where he pursues his trade. He was notified of the Board's order fixing minimum prices. The minimum prices fixed by the Board were above those he was then charging. For about two months after receiving notice of the order, he charged prices in keeping with the order. At the end of the two months' period, he went back to his old prices. The Board was notified that he was violating its order and sent inspectors to get the proof. Subsequently he was called for trial before the Board. Evidence was adduced showing that he was disregarding the Board's order, and the Board suspended his license for six months and ordered him ·to cease business.

After his license was suspended, defendant continued to operate his shop, charging prices for his work less than the minimum fixed by the Board. Whereupon the Board brought this proceeding against him, under

Section 8 of the Act, alleging the facts above stated and praying that he be permanently enjoined from conducting his barber shop.

In addition to the civil proceeding brought by the Board to enjoin him from pursuing his trade, defendant is confronted with a criminal charge, filed by the district attorney under Section 8 of the Act. A copy of the bill of information was filed in evidence. The record shows, however, that the criminal case had not been disposed of at the time this civil proceeding was heard.

In his answer to this injunctive proceeding brought against him by the Board, defendant admitted that the prices he was charging for his work were less than the minimum prices fixed by the Board.

As a defense against the proceedings brought against him by the Board, he interposed the special plea that Act No. 48 of 1936, and especially Section 12 thereof, which grants to the Board the power to fix minimum prices for barber work, is unconstitutional, and for that reason the Board's order was null.

We here transcribe the pertinent portions of his answer and plea:

"That said Act, particularly Section 12 thereof, is in violation of Article 4 of the Constitution of Louisiana, particularly Section 7 of said Article 4, which provides that 'No law shall be passed fixing the price of manual labor'."

"That said Act 48 of 1936, particularly Section 12 thereof, is in violation of Article 1 of the Constitution of Louisiana, particularly Section 2 thereof, which provides that no person shall be deprived of life, liberty or property, except by due process of law."

"Further answering the petition, respondent avers that said Act No. 48 of 1936, the whole of said Act, particularly Section 12 of said Act, is in violation of the Constitution of the United States, particularly the fourteenth amendment thereof, [U.S.C.A.Const. Amend. 14], in that it seeks to deprive respondent of his liberty and property without due process of law, and to deny him of the equal protection of the laws, and in that it further, if enforced, would destroy his right of freedom of contract, necessary to enable him to earn a living for himself and his dependents; that his customers, owing to their lack of means, are unable to contract with him for his services as a barber, since they are unable to pay the minimum prices fixed by plaintiff, which are unreasonable and too high."

Elaborating his answer in connection with his plea of unconstitutionality, defendant alleged:

"Respondent avers that he is unable to earn a living if compelled to charge the minimum prices fixed by said plaintiff since his patrons are unable, because of their poverty and lack of means, to pay said prices, which are unreasonable, being too high and beyond the ability of his customers and patrons to pay; that the loss of his customers' patronage, due to the fact that they are unable to pay the unreasonable, high minimum prices fixed by said plaintiff, will deprive, and does deprive, respondent, of his liberty, of his

property, and of his right to contract and earn a living, for himself, as well as his wife and children, who depend upon him for support."

Issue being thus joined, the case went to trial. Both the Board and the defendant introduced evidence. There was judgment refusing the injunctive relief prayed for by the Board and decreeing "that Section 12 of Act No. 48 of 1936 be, and it is hereby, declared unconstitutional, void and without effect". This appeal is prosecuted by the Board.

We proceed at once to state the facts adduced at the trial, as disclosed by the record before us, because, in order to decide whether the Act is constitutional or not, it is necessary to decide whether the prices charged for barbering work under such circumstances and conditions as were shown to exist in this case, or may exist in any Judicial District in the state, have any real and substantial relation to the object or end to be accomplished by the legislation, which object is declared to be the protection and preservation of the public health.

Some of the pertinent facts are shown by official records made and kept by the Board. Others were admitted by the Board at the trial. The testimony of the defendant is not disputed.

There is in the record a statement of facts which was introduced in evidence at the trial and filed. We quote first the following extract from that statement:

"It is further agreed that on January 30th, 1937 the State Board of Barber Ex-

aminers of Louisiana issued a certificate to the defendant, Noah E. Parker of Bernice, Louisiana, bearing its No. 3377B9, wherein the said defendant was authorized by said Board to practice as a barber in conformity with the provisions of Act 247 of the Legislature of Louisiana of 1928 and the provisions of the amending Act 126 of said Legislature for the year 1932, as per Exhibit marked 'D'."

The plaintiff Board therefore admitted that defendant had been examined by the Board of Barber Examiners, as constituted by Act No. 247 of 1928, and found duly qualified to pursue the trade or business of barbering, and that a certificate to that effect had been issued to him.

Act No. 247 of 1928 is an Act, according to its title, "To regulate and define the profession of barbering, to create a Board of Examiners for the licensing of persons to practice said profession, and to practice as apprentices in said profession; to prescribe qualifications therefor; * * * to provide rules and regulations for the sanitation of barber shops; barber schools and barber colleges, for the purpose of promoting the general safety of the public".

Section 1 of the Act, as amended by Act No. 126 of 1932, provides that, after January 1, 1929, no person shall practice barbering without a certificate of registration issued by the Board of Barber Examiners, which Board is created by Section 20 of the Act, as amended by Act No. 126 of 1932. The Act, in Sections 5 and 6, prescribes the qualifications which one must be found to possess before a certificate or

license can be issued to him by the Board. The Act provides that no certificate of qualification shall be issued unless the applicant is at least 18 years of age, of good moral character and of temperate habits; unless he is free from any contagious or infectious disease, and has graduated from a school of barbering approved by the Board and has practiced as an apprentice for at least six months.

As we have said, the defendant was called before the Board of Barber Examiners and tried on the charge that he was disregarding the Board's order fixing minimum prices. Testimony was adduced before the Board, and at the trial of the case before the court the testimony taken at the trial before the Board was introduced in evidence. Mr. Terrill, an inspector for the Board, was called as a witness for the Board. He testified that he had inspected defendant's barber shop, and, on being asked about the sanitary conditions of the shop, said, "Well, I suppose it was sanitary, but it wasn't a modern shop, but fair for a small town shop". He was asked whether defendant had adequate sterilizing facilities and said, "I noticed a sterilizer on the work bench". He was asked whether the barber's tools were in the sterilizer and said, "Yes, they were".

There was filed in evidence an inspection report made by an inspector appointed by, and working under, the Louisiana State Board of Barber Examiners. This report, dated May 18, 1936, shows that, in so far as sanitary conditions were concerned, defendant's barber shop was "Grade A", which, according to a legend printed at the bottom of the report, means "Good". We here quote the grades as shown by the certificate: Personal Appearance, A; Sterilization, A; Work Stand, A; Drawers, A; Sink, A; Tools, A; Linens, A; Dusters, A; Mugs and Brushes, A; Hones and Strops, A; Chairs, A.

It appears, therefore, that the defendant had complied with all the rules and regulations prescribed by law and the Board of Barber Examiners as to personal qualifications, and that the Board found no cause of complaint regarding the sanitary condition of his barber shop. The inspector gave him "Grade A" on all points.

It is appropriate to state here that this certificate of qualification and the inspection certificate giving the defendant "Grade A" on the sanitary condition of his barber shop were issued at a time when he was charging fifteen cents for a shave and twenty-five cents for a hair-cut, which charges are less than the minimum fixed by the Board.

Referring again to the agreed statement of facts, we quote the following extracts therefrom:

"It is further agreed that the defendant charged from February 4th, 1936 to about October 10th, 1936 twenty-five cents for hair cuts and fifteen cents for shaves during which period of time he was able to earn a living; that for about a period of three months from October 10th, 1936 he charged for his work as a barber the prices agreed to under which said minimum price fixed for said Board of Barber Ex-

aminers namely, 40¢ per hair cut and 25¢ per shave during which period of time he was unable to earn a living. Due to the fact that a large number of persons residing in and near Bernice, who were his patrons were unable to pay 40¢ for haircuts and 25¢ for shaves, with the result that the income of the defendant was reduced to the point where he was unable to earn a living.

"That since and after charging the minimum prices as fixed in' the price agreement of the barbers, adopted by the Board, he charged 25¢ for haircuts and 15¢ for shaves, when his income was increased to the point where he was able to earn a living."

The defendant as a witness in his own behalf testified that he was married, living with his wife and that they had seven children, all living with them; that his license and the certificate of inspection were issued to him while he was charging fifteen cents for shaves and twenty-five cents for hair-cuts; that, during all the time he charged these prices, his revenue from his barber shop, which included his personal earnings and the percentage he received from his helpers, was from $175.00 to $200.00 per month—an amount which was ample to support himself and his family and to keep his shop in such sanitary condition as was required by the Board of Barber Examiners and the State Board of Health; that, during the time he charged twenty-five cents for shaves and forty cents for hair-cuts, which were the minimum prices fixed by the Board, his revenue was so reduced that he was unable

to make a living; that, when he abandoned the prices fixed by the Board and went back to his original prices, his revenue again became sufficient for all his needs.

There was no attempt to rebut the testimony of the defendant. In fact, the major portion of it is embodied in the agreed statement of facts.

We find no merit in defendant's plea that Section 12, Act No. 48 of 1936, violates Section 7, article 4, of the State Constitution, which provides that "No law shall be passed fixing the price of manual labor". The occupation of a barber is classed as a "mechanical pursuit" and not as manual labor. State v. Hirn, 46 La.Ann. 1443, 16 So. 403; State v. Dielenschneider, 44 La. Ann. 1116, 11 So. 823; State v. Cohn, 184 La. 53, 165 So. 449.

Section 2, Article 1, of the State Constitution says that "No person shall be deprived of life, liberty or property, except by due process of law". And the Federal Constitution (U.S.C.A. Const. Fourteenth Amendment) contains this provision:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

It is too clear to admit of argument that, if the statute under consideration is valid legislation and is enforced in this case, defendant's freedom to enter into such contracts relating to his work as he sees fit to

make, which freedom is guaranteed to him by the Constitution of this state and that of the United States, will be utterly swept away. His right to work and earn a living and his right to sell his services at his own prices will be stricken down. In a legal sense, these rights and privileges are property. This property will be taken from him. He will be deprived of his liberty, for the right to make contracts is embraced within the concept of liberty as guaranteed by both the State and the Federal Constitutions.

If the statute is valid, the courts are bound to grant the injunction prayed for by the Board, and, not only that, if the criminal prosecution now pending against him is pressed, he may be deprived of his liberty of person under that Section of the Act which makes a violation of the Act, or of any rule or order made by the Board, a misdemeanor, the punishment for which is a fine of not less than $25.00 and not exceeding $300.00, or imprisonment for not less than six months, or both.

In the case of Allgeyer et al. v. State of Louisiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832, the Supreme Court of the United States reaffirmed the following principle, which is fundamental under our form of government:

" 'Liberty,' as used in the provision of the fourteenth amendment to the federal constitution, forbidding the states to deprive any person of life, liberty, or property without due process of law, includes, it seems, not merely the right of a person to be free from physical restraint, but to be free in the enjoyment of all his faculties in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation; and for that purpose to enter into all contracts which may be proper, necessary, and essential to carrying out the purposes above mentioned." (Syl. 1)

See also Coppage v. Kansas, 236 U.S. 1, 35 S.Ct. 240, 59 L.Ed. 441, L.R.A.1915C, 960.

These rights and privileges cannot be taken from a citizen without due process of law. But the right to contract, to own and use property, is not absolute. Private rights must always yield to the public good. In the case of Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469, the Supreme Court said (page 510):

"Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest."

The power of the state to promote the general welfare, to protect the health and morals of the people generally, is inherent in government. To that end, the state may regulate any business affected with a public interest.

Now conceding that the barbering business is "affected with a public interest", in the sense that it affects the health and safety of the public, it follows that the state may regulate it to the extent of requiring barber shops, as well as barber schools, and all linens, mugs and brushes, shears and strops, etc., used therein, to be kept clean and in a sanitary condition, and may require barbers to possess certain qualifications. That, we think, cannot be questioned. It has been so held by the courts of this and other states. Such regulations are necessary to protect the public health. Not only has the state that power, but it is burdened with the duty to do so. Such regulations and requirements are valid under the state's police powers.

This state exercised that power and discharged that duty by adopting Act No. 247 of 1928, which Act was amended by Act No. 126 of 1932. That is purely a regulatory statute. It requires barbers to possess certain qualifications to be ascertained by an examination conducted by a Board of Examiners created by the Act. The Act provides that, before an examination is given, the applicant must present evidence of good moral character and temperate habits; that he must be free from disease and be graduated from a school of barbering approved by the Board.

As to sanitation, Section 22 of the Act, as amended by Act No. 126 of 1932, provides that the Board shall have authority "to prescribe sanitary requirements for barber shops and schools, subject to the approval of the State Board of Health", and that "any member of the Board, its agents, or assistants, shall have authority to enter, and to inspect, any barber shop or barber' school at any time during business hours". It is provided in Section 21, as amended by Act No. 126 of 1931, that the Board "shall have authority to employ inspectors, clerks and other assistants, as it may deem necessary to carry out the provisions of this Act, for such compensation as it may determine".

Section 18 of this Act, as amended by the Act of 1932, specifies in minute detail all the precautions which must be taken by barbers to protect public health.

The same section of the Act makes it a misdemeanor punishable by a fine of not less than $25.00 or more than $200.00 for any barber to violate any of these prescribed regulations.

A more complete set-up for the protection of the health and safety of the patrons of barber shops and the public can hardly be imagined. The Act is replete with details. The machinery set up for its enforcement is perfect. The enforcement of its provisions by the Board which it creates and which is given full power and authority to see that all such regulations are observed, affords all the protection to the public health that it is possible to give.

But Act No. 48 of 1936 goes further. Section 12 confers upon that Board the additional power and authority to fix minimum prices to be charged by barbers for their work in each of the Judicial Districts of the state.

It is true that the state may, on proper occasion and for adequate reasons, strike

down private contracts, take or destroy private property, or deprive a citizen of his liberty to be at large. But such cannot be done except in the exercise of its police power. Police power is inherent in the state. Under that power the state may enact laws to protect and preserve social order, to restrict and punish crime, to preserve the public peace, to safeguard and protect the health and morals of the people, even though the effect of such laws is to strike down private contracts, to deprive the citizen of his liberty to contract and to take from him or destroy his property. But the legislature is prohibited from enacting such laws except on proper occasion and for adequate reasons. If the reasons are not adequate, such legislation violates the due process clauses of the Constitutions.

The foundation laid to support Section 12 of this Act is declared in Section 1 thereof to be "to protect the public welfare, public health and public safety". The Act was therefore adopted under the guise of exercising the state's police power. Section 1 of the Act declares "That this Act is enacted in the exercise of the police power of this State".

The declared purpose of the Act, the end sought to be attained, is a legitimate exercise of the state's police power. But the question which at once arises is whether there is any real and substantial relation between the prices charged for services in barber shops and the public health and safety.

Under the Act the fixing of prices is resorted to as a means to attain the end

sought. If the means prescribed bears no relevancy and has no real and substantial relation to the end sought to be attained, the very foundation of Section 12 of the Act, the price fixing provision, is swept away and the Section must fall.

As we have already pointed out, the public health and safety, in so far as it is affected by the business of barbering, is amply protected by the regulatory Act of 1928, as amended in 1932. If the provisions and requirements of that Act are complied with—and the Board of Barber Examiners is given full power and authority to see that they are—the public health and safety cannot possibly be affected by the prices charged by barbers for their services.

This court has already decided that a city, which may, like the state, adopt measures to protect the public health under its police power, cannot, under the guise of exercising that power, control the operation of barber shops by means which have no real relation to, or connection with, the public health. In City of Alexandria v. Hall, 171 La. 595, 131 So. 722, a barber was convicted of violating an ordinance of the city which provided that barber shops and beauty parlors should not be opened before 8:00 a. m. and should be closed by 6:30 p. m. except on Saturdays and days preceding legal holidays. He attacked the ordinance on the ground that it deprived him of his personal liberty.

The city attempted to maintain the constitutionality of the ordinance on the ground that it was a health measure, adopted to protect the public health, and

to that end introduced testimony of medical experts, who testified that the "longer the hours of work are, the more run-down becomes the system of the barber, and the more susceptible is he to communicable diseases, and that thereby the public health may become endangered".

The same ordinance which prescribed the hours for the opening and closing of barber shops and beauty parlors also provided that "All barber and beauty shops and parlors shall be open for inspection any time during business hours to the City Health Officer or his deputies or assistants", and provided "for the sterilization of all tools and instruments used in barber or beauty shops". It further provided that "no person afflicted with any communicable disease shall work or be employed in any such shop or be served therein". It provided further that "The Health Officer of the City of Alexandria shall have the power to require a barber suspected by him of having any communicable disease to submit himself for examination by a practicing physician or the Health Officer".

That ordinance, like the regulatory Act of 1928 to which we have referred, if enforced, afforded ample protection to the public. The ordinance was held to be unconstitutional, this court saying through Justice Land as its organ (page 724):

"In our opinion, the public health is protected by the provisions of the ordinance itself requiring inspection of barber shops, sterilization of instruments, and examination of all barbers suspected of having communicable diseases.

"Besides, the requirement in the ordinance that barber shops shall be closed at 6:30 p. m. throughout the year, with certain exceptions, is not really an appropriate measure for the protection of the public health, as the alleged necessity for the restriction in the ordinance bears no reasonable relation to public health, is not supported by anything of substance, but rests, in our opinion, upon mere conjecture."

In the course of the opinion, Justice Land quoted at length from the case of State v. City of Laramie, 40 Wyo. 74, 275 P. 106, 107. Among other things, the Wyoming Supreme Court said:

"The claim that the restriction in the law bears a reasonable relation to a public interest must not rest on mere conjecture, but must be supported by something of substance."

There is a deadly parallel between the Hall Case and the one at bar. There the ordinance itself provided for the protection of the public health. Here the regulatory Act of 1928, as amended in 1932, contains ample provisions for that purpose. There the contention made to support the validity of the ordinance was the "conjecture" that the fixing of the hours for opening and closing of barber shops had some reasonable connection with the public health. Here Act No. 48 of 1936 declares in Section 1 that, due to competition and unfair price cutting, the prices presently prevailing for services rendered by barbers have become so low that "it is impossible for an average barber, although working regularly, to sup-

port and maintain reasonably safe and healthful barbering services to the public."

This, too, is mere "conjecture", because it is common knowledge that economic conditions are not everywhere the same. A foundation to support legislation of this character cannot be created by legislative fiat.

For the fixing of minimum prices for barbering services, each Judicial District is made a unit. We take official cognizance of the composition, location and size of each Judicial District in the state, as well as the location and size of each of the cities and villages therein. These are all shown by the Constitution, official maps and census enumerations. We know that in some of the Districts there are both cities and villages.

Section 12 of the Act says that:

"In determining reasonable minimum prices, the Board shall take into consideration the necessary costs incurred in the particular Judicial District in maintaining a barber shop in a clean, healthful and sanitary condition."

Economic conditions in the cities and the villages are not the same. It is common knowledge that the costs of living and the costs of conducting any kind of business are higher in cities than in villages. All overhead charges, such as the price of lots, the cost of building, rents and taxes, are higher in cities. Therefore the necessary costs incurred by city barbers in conducting their businesses are higher than those incurred by village barbers. The same is true as to barber shops in different sections of the same city. It necessarily costs more to operate a five-chair barber shop in the business or financial sections of New Orleans, Baton Rouge, Lake Charles and Shreveport than to conduct one of the same size and equally sanitary in the outlying and poorer sections of the cities.

For this reason the village barber and the barber whose shop is located outside the "high rent" and most expensive section of a city can well afford to sell their services for less than the others must necessarily demand for like services and, at the same time, keep their shops in a clean, sanitary condition.

All the law requires, all it can require, of any barber is that he have such personal qualifications and keep his shop in such sanitary condition as to protect the public health. If he lives up to these requirements, he cannot be restrained from, nor penalized for, selling his services at such prices as are satisfactory to himself and his customers.

The reasons we have stated above show and the facts adduced at the trial of this case demonstrate that the price-fixing Section of this Act rests upon an erroneous premise; that it rests upon "conjecture" and is not "supported by anything of substance".

In Nebbia v. People of State of New York, supra, the Supreme Court upheld the New York law which authorized the Milk Control Board to fix the prices of milk. That case is cited by counsel for the Barber Board in this case. But the "occasion" for

that law was not "conjecture" but the facts found to exist by a legislative committee, which facts are that "The situation of the families of dairy producers had become desperate and called for state aid similar to that afforded the unemployed, if conditions should not improve", and that the supply of milk, "an essential item of diet", would be so diminished as to affect the public health.

Two recent cases, decided by courts of other states, are on all fours with the one at bar. In City of Mobile v. Pat Rouse, 233 Ala. 622, 173 So. 266, 111 A.L.R. 349, decided March 18, 1937, Rouse, a barber, was convicted in a recorder's court for serving his customers at prices less than the minimum prices fixed by a city ordinance. He appealed to the Circuit Court of Mobile County, and at the trial there he attacked the validity of the ordinance, "on the ground that the fixation of a minimum charge for such personal services by ordinance was an invasion of their constitutional liberty". He also questioned on the same ground the constitutionality of the act of the state legislature which purported to confer authority on municipalities having a population of not less than 60,000 and not more than 250,000 inhabitants, to fix by ordinance such minimum prices.

The Circuit Court of Mobile County reversed the ruling of the recorder's court and held that the ordinance was invalid. The City of Mobile applied to the Supreme Court of Alabama for writs to review the ruling of the Circuit Court. The writs were denied. The supreme court said that, if the act of the legislature authorizing the city to fix minimum prices was constitutional, the ordinance was valid, and it was necessary therefore to decide whether the act of the legislature was constitutional.

The supreme court held that the act of the legislature was unconstitutional and that the ordinance was therefore invalid.

Act No. 48 of 1936 seems to be identical in every detail with one adopted by the legislature of Florida in 1935. In State ex rel. Fulton v. Ives, 123 Fla. 401, 167 So. 394, the Florida act was declared unconstitutional by the supreme court of that state. In that case, Fulton, a barber, applied to the State Board of Barber Examiners for a renewal of his certificate of registration as a barber. The Board refused to issue the certificate (page 395) "because of the applicant's alleged 'failure to live up to the prices as set' by the board of barber examiners in July, 1935, by an order 'purporting to fix a minimum price for all work usually performed by Relator as a registered and practicing barber in the City of Jacksonville, Florida' ".

The barber's attack against the Florida law was identical with that urged by the barber in the case at bar against the Louisiana statute.

The opinion of Ellis, presiding justice, holding the act unconstitutional, and the special concurring opinion of Justice Brown are both quite illuminating and are directly in point here.

For the reasons assigned, the judgment declaring Section 12, Act No. 48 of 1936, unconstitutional is affirmed.

PONDER, J., dissents.

LAND, Justice (dissenting).

I respectfully dissent from the majority opinions in these two cases, in which it is held that Section 12 of Act No. 48 of 1936 is unconstitutional.

Act No. 48 of 1936 is entitled "An Act To regulate and control the Barber Industry, and for that purpose to further enlarge the present powers of the Board of Barber Examiners; defining its additional jurisdiction, powers, and duties; to approve agreements from each Judicial District; and providing penalties for violation of this Act".

The purposes of the Act are thus set forth in Section 1:

"Be it enacted by the Legislature of Louisiana, That this Act is enacted in the exercise of the police power of this State and its purposes generally are to protect the public welfare, public health and public safety.

"It is hereby declared that unfair, unjust, destructive, demoralizing and uneconomic trading practices have· been and are now being carried on in the operation of barber shops in the State of Louisiana, and that unfair competition exists between the individual barbers of this State to the extent that prices have been reduced by such unfair competition to the point where it is impossible for an average barber, although working regularly, to support and maintain reasonably safe and healthful barbering services to the public.

"That such conditions constitute a menace to the health, welfare and reasonable comfort of the inhabitants of this State, and tend to the transmission of disease.

"That as the barber business affects the health, comfort and well-being of our citizens, and of the public which patronizes the barbers of the State of Louisiana, in order to promote the public welfare, health and safety, and to prevent the transmission of disease, in view of the personal touch and contacts manifested and exercised in the barber business, and the need for well-nourished, strong and healthy persons to engage in the barber business, the barber profession is hereby declared to be a business affecting the public health, public interest and public safety.

"That the present acute economic condition, being in part the consequence of a severe and increasing disparity between the prices of barber work and other commodities, which disparity has largely destroyed the purchasing power of barbers for industrial and sanitary products so necessary in the operation of their business, has broken down the orderly performing of the duties of the barbering profession and has seriously impaired and injured the public health and safety.

"That the danger to the public health, safety welfare is immediate and impending, the necessity urgent, and such as will not admit of delay in public supervision

and control in accord with the proper standards of the barber profession. The foregoing statement of fact, policy and application of this Act are hereby declared as a matter of legislative determination."

Under the conditions and state of facts set forth in, Section 1 of this Act, the Legislature enacted "Section 12. Order Fixing Prices of Barber Work".

This section provides:

"(a) That the Board shall have the power to approve price agreements establishing minimum prices for barber work, signed, and submitted by any organized groups of at least 75% of the barbers of each Judicial District, after ascertaining by such investigations, and proofs as the condition permits and requires, that such price agreement is just, and under varying conditions, will best protect the public health and safety by affording a sufficient minimum price for barber work to enable the barbers to furnish modern and healthful services and appliances, so as to minimize the danger to the public health incident to such work."

The provisions of Section 1 of the Act, as well as of Section 12(a), plainly declare and clearly show that the establishment of minimum prices for barber work is necessary to secure proper sanitation in barber shops, and, for that reason, the establishment of such prices bears a reasonable relation to the public health.

It is difficult, therefore, to understand how it can be logically held in the majority opinion that no such relation exists. And it is more difficult to understand how there can be any possible discrimination, in a constitutional sense, against the defendants in these two cases, or against any other barber in the Fourth Judicial District of the State, or against the public in that district, when the minimum prices for barber work is the same throughout the Fourth Judicial District; and is the same in the City of New Orleans, in which one of these defendants resides.

In order to emphasize the reasonable relation between the establishment of minimum prices for barber work in any judicial district to the public health, it is further provided in Section 12(a) of the Act:

"The Board shall take into consideration all conditions affecting the barber profession in its relation to the public health and safety.

"In determining reasonable minimum prices, the Board shall take into consideration the necessary costs incurred in the particular Judicial District in maintaining a barber shop in a clean, healthful and sanitary condition.

"(b) The Board, after making such investigation, shall fix by official order, the minimum price for all work usually performed in a barber shop.

"(c) That if the Board after investigation, made either upon its own initiative, or upon the complaint of a representative group of barbers, determines that the minimum prices so fixed are insufficient to properly provide healthful services to the public and keep the shops sanitary, then the Board from time to time shall have

authority to vary or re-fix the minimum prices for a barber's work in each Judicial District."

It is therefore manifest that, under these provisions, the Board does not and cannot fix arbitrary prices for work done in barber shops; but that the very basis of the minimum prices established is their reasonable relation to, and their sufficiency, "to properly provide healthful services to the public and keep the shops sanitary".

If a lone barber in Bernice, Union Parish, in the Fourth Judicial District, or a lone barber in the City of New Orleans, could upset the minimum prices fixed for barber work by the Board in any Judicial District of the State, or in the City of New Orleans, after due investigation officially made, it is clear that the State, in the exertion of its sovereign police power to protect the public health and the public welfare, would have to yield supinely to the individual liberty of contract and to the individual right to the use and enjoyment of property, under the Fourteenth Amendment of the Constitution of the United States, U.S.C.A.Const. Amend. 14.

The result would be an end to the police power of the State. This is not my conception of the law in such cases.

"It is well settled that neither the Fourteenth Amendment, nor any other amendment to the federal Constitution, interferes with the proper exercise of the police power by the state, or by its municipalities, acting under delegated and plenary authority. Barbier v. Connolly, 113 U.S. 27, 5 S.Ct. 357, 28 L.Ed. 923; L'Hote v. New Orleans, 177 U.S. [587] 588, 20 S.Ct. 788, 44 L.Ed. 899; State v. McCormick, 142 La. 580, 77 So. 288, L.R.A.1918C 262; Lacoste v. Department of Conservation, 151 La. 909, 92 So. 381; State v. City of New Orleans, 151 La. 24, 91 So. 533.

"The police power extends to all property located within the jurisdiction of the several states, as well as to all contracts made within such jurisdiction, if such contracts in their execution affect the public health, the public morals, or the public safety.

"The constitutional prohibition upon State laws impairing the obligation of contracts does not restrict the power of the State to protect the public health, the public morals, or the public safety, as the one or the other may be involved in the execution of such contracts. Rights and privileges arising from contracts with a State are subject to regulations for the protection of the public health, the public morals, and the public safety, in the same sense, and the same extent, as are all contracts and all property, whether owned by natural persons or corporations. New Orleans Gaslight Co. v. Louisiana Light Co., 115 U.S. 650, 672, 6 S.Ct. 252, 264, 29 L.Ed. 516, 524; New Orleans Gaslight Co. v. Drainage Commission, 197 U.S. 453, 25 S.Ct. 471, 49 L.Ed. 831; Chicago & A. R. Co. v. Tranbarger, 238 U.S. 67, 35 S.Ct. 678, 59 L.Ed. 1204." City of Shreveport v. Kansas City, S. & G. Ry. Co., 167 La. 771, 779, 780, 120 So. 290, 293, 62 A.L.R. 1512.

In the opinion of the writer of this dissent, the establishment of minimum prices,

under Section 12 of Act No. 48 of 1936, for work done in the barber shops in the various Judicial Districts of the State, is the legitimate exertion of the police power of the State, to which the individual liberty of the defendants to contract must necessarily yield.

It is admitted in the opinion of the majority that barbers are not included in Section 7 of Article 4 of the State Constitution of 1921, which provides that "No law shall be passed fixing the price of manual labor", for the reason that they are mechanics. Then, there is no law, State or Federal, that prohibits the Legislature of this State from establishing minimum prices for barber work in the barber shops of this State. And particularly is this the case, since Act No. 48 of 1936 in Section 1 declares that "the barber profession is hereby declared to be a business affecting the public health, public interest and public safety", and is therefore subject to police regulation.

The case of the City of Alexandria v. Hall, 171 La. 595, 131 So. 722, is cited in the majority opinion, with the statement that "There is a deadly parallel between the Hall Case and the one at bar". This statement is more rhetorical than accurate. The Hall Case was decided December 1, 1930, or six years before Act No. 48 of 1936 was enacted. It is therefore clear that Section 12 of this Act was not before the Supreme Court when the Hall Case was decided.

Nor was Act No. 247 of 1928, creating the Board of Barber Examiners, before this Court in the Hall Case. In that case, the constitutionality of Section 4 of Ordinance 276 of the City of Alexandria, enacted under Act No. 136 of 1898, and amendments thereto, was assailed and passed on.

This ordinance required barber shops to close at 6:30 P. M. except on Saturdays and days preceding legal holidays. It was attacked as depriving defendant of his property and liberty without due process of law, and as an unwarranted and arbitrary interference with his constitutional right to carry on a lawful business.

It is said in the Hall Case, at page 601, 131 So. at page 724:

"The city of Alexandria has attempted to maintain the constitutionality of the ordinance by the introduction of medical experts who have testified that the longer the hours of work are, the more run-down becomes the system of the barber, and the more susceptible is he to communicable diseases, and that thereby the public health may become endangered.

"In our opinion, the public health is protected by the provisions of the ordinance itself requiring inspection of barber shops, sterilization of instruments, and examination of all barbers suspected of having communicable diseases.

"Besides, the requirement in the ordinance that barber shops shall be closed at 6:30 p. m., throughout the year, with certain exceptions, is not really an appropriate measure for the protection of the public health, as the alleged necessity for the restriction in the ordinance bears no reasonable relation to public health, is not sup-

ported by anything of substance, but rests, in our opinion, upon mere conjecture."

On the other hand, Act No. 48 of 1936 does show the reasonable relation to public health of the establishment of minimum prices for barber work, as it is the means adopted for the enforcement of the Act in the maintenance of necessary and proper sanitation in barber shops. The expense of such sanitary measures is imposed by the Act upon the barber under the police power of the State as a police regulation and exaction, and necessarily adds to the overhead expenses of running his shop.

The Legislature has found as a fact in Section 1 of this Act, that, due to "unfair, unjust, destructive, demoralizing and uneconomic trading practices", and "unfair competition", carried on in the operation of barber shops, "it is impossible for an average barber, although working regularly, to support and maintain reasonably safe and healthful barbering services to the public".

A lone barber in the whole Fourth Judicial District says, to the contrary, that it is possible to support and maintain reasonably safe and healthy barbering services to the public, at less than the minimum prices fixed under Section 12 of Act No. 48 of 1936. And defendant makes this contention, despite "the unfair, unjust, destructive, demoralizing and uneconomic trading and unfair competition", carried on in the operation of barber shops in the State, and declared to exist as a fact by the Legislature itself.

Indeed, he makes this contention, despite the fact that these minimum prices are fixed by the Board upon the agreement of 75

per cent. of the barbers of the Fourth Judicial District, and after the Board itself has ascertained "by such investigations, and proofs as the condition permits and requires, that such price agreement is just, and under varying conditions, will best protect the public health and safety by affording a sufficient minimum price for barber work to enable the barbers to furnish modern and healthful services and appliances, so·as to minimize the danger to the public incident to such work".

The complaint of defendant is not that the minimum prices established for barber work in the Fourth Judicial Dsrtict are insufficient to enable him to maintain sanitary conditions in his shop; but that the minimum prices established by the Board are too high for his particular line of customers.

It is indeed refreshing, in these days of economic depression and recession, to hear a workman complain that the minimum price fixed by a State Board for his work is so high that he cannot make a living!

The same "too high" argument can be made as well against the payment of taxes, although equal and uniform; and against the payment of lawful governmental exactions generally. ·

· In other words, the defendant says to the State, if you want to exercise your police power over my barber shop, you must do so at my individual prices for haircuts and shaves, and not at the uniform minimum prices which you have found, through your Board, to be just and reasonable throughout the Fourth Judicial District, in order

to maintain sanitary conditions in the barber shops in that district.

Manifestly, such an argument is unsound and fallacious, since if it is maintained, in this or any other case, it would prevent the proper and uniform exercise by the State of its police power altogether, and would disrupt the orderly functioning of the government itself.

I respectfully dissent from the holdings in these two cases, that Section 12 of Act No. 48 of 1936 is unconstitutional, since, in my opinion, this section of the Act is clearly constitutional as a proper exercise of its police power by the State.

ROGERS, Justice (dissenting).

I concur in the dissenting opinion of Mr. Justice LAND.

The occupation of barber operates directly on the person, thereby directly affecting the health of the public. And because of its intimate relation to the public health, it may, under the police power, be regulated by law without depriving a citizen of his natural rights and privileges guaranteed by the fundamental law. 7 Am.Jur., pp. 613, 614.

A barber is a public, not a private, contractor. His business contacts are exclusively public in character. The nature of his occupation requres him to serve all persons who apparently in good physical condition apply for his services in the turn in which they apply. His calling represents an essential activity incident to the welfare of every community in a state.

Realizing these conditions, legislatures in many states have imposed burdensome regulations upon persons engaged in operating barbershops, to the end that the public health may be protected. Statutes of this kind have uniformly been held to be valid. 7 Am.Jur. p. 614. This state has adopted such legislative acts. See Act No. 247 of 1928, Act No. 126 of 1932 and Act No. 48 of 1936.

If the legislature has the power in the interest of the public health to impose burdensome regulations on those engaged in the operation of barbershops, I cannot see why it should not have the power to protect those upon whom it imposes the regulations from unfair competition and ruinous practices.

The provisions of Act No. 48 of 1936, which is under attack here, are sufficiently set forth in the majority opinion by Mr. Justice Odom and the dissenting opinion by Mr. Justice Land, and it is needless for me to repeat them.

Section 1 of Act No. 48 of 1936, declares that the barber business is one affecting the public health, interest and safety.

The right to make contracts, in the field of state action, is subject to the essential authority of government to maintain peace and security, and to enact laws for the promotion of health, safety, morals and welfare of those subject to its jurisdiction. Chicago, B. & Q. R. Co. v. McGuire, 219 U.S. 549, 31 S.Ct. 259, 55 L.Ed. 328.

In that case it was also held, citing many others to the same effect, that freedom of

contract is a qualified, and not an absolute, right; that there is no absolute freedom to do as one wills or to contract as one chooses, and that the guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or to deny to government the power to provide restrictive safeguards.

See to the same effect State v. Payssan, 47 La.Ann. 1029, 17 So. 481, 49 Am.St.Rep. 390, reaffirmed in State v. Morris, 47 La. Ann. 1660, 18 So. 710; West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703, 108 A.L.R. 1330; Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469.

In the Nebbia case, the Supreme Court of the United States speaking through Mr. Justice Roberts, said (page 510):

"Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest."

In the Nebbia Case the court also said:

"But we are told that because the law essays to control prices it denies due process. Notwithstanding the admitted power to correct existing economic ills by appro-

priate regulation of business, even though an indirect result may be a restriction of the freedom of contract or a modification of charges for services or the price of commodities, the appellant urges that direct fixation of prices is a type of regulation absolutely forbidden. His position is that the Fourteenth Amendment requires us to hold the challenged statute void for this reason alone. The argument runs that the public control of rates or prices is per se unreasonable and unconstitutional, save as applied to businesses affected with a public interest; that a business so affected is one in which property is devoted to an enterprise of a sort which the public itself might appropriately undertake, or one whose owner relies on a public grant or franchise for the right to conduct the business, or in which he is bound to serve all who apply; in short, such as is commonly called a public utility; or a business in its nature a monopoly. The milk industry, it is said, possesses none of these characteristics, and, therefore, not being affected with a public interest, its charges may not be controlled by the state. Upon the soundness of this contention the appellant's case against the statute depends."

The court then proceeds to state the principles of law, which in my opinion, are appropriate to the instant case, as follows, viz.:

"We may as well say at once that the dairy industry is not, in the accepted sense of the phrase, a public utility. We think the appellant is also right in asserting that there is in this case no suggestion of any monopoly or monopolistic practice. It goes

without saying that those engaged in the business are in no way dependent upon public grants or franchises for the privilege of conducting their activities. But if, as must be conceded, the industry is subject to regulation in the public interest, what constitutional principle bars the state from correcting existing maladjustments by legislation touching prices? We think there is no such principle. The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the state is incapable of directly controlling the price itself. This view was negatived many years ago. Munn v. Illinois, 94 U.S. 113, 24 L. Ed. 77." The court then goes on to discuss and show the applicability of the decision in Munn v. Illinois, supra.

In the Nebbia Case, the legislative enactment which resulted in a fixed price for the retailing of milk was maintained against an attack that it contravened the equal protection and due process clauses of the federal constitution. In commenting upon that decision, Ambrose Doskow, in "Historic Decisions of the United States Supreme Court," says:

"The precedents on which Nebbia's counsel relied * * * were the cases in which price-fixing had been held to violate the due process clause on the ground that the business to which it was applied was not one 'affected with a public interest.' The regularity with which the Court had invalidated price-fixing statutes, and the sweeping language it had used in doing so, had given rise to the belief that the test of due process of law, vague and varying in other circumstances, imposed a specific rule that the direct fixing of prices is always an unwarranted interference with liberty of contract except in a business that meets the magic formula that it is 'affected with a public interest.' The opinion of the Court by Mr. Justice Roberts repudiates this view and places price-fixing with other types of restrictions on the use of private property as one which is invalid only if arbitrary in its particular application. The earlier cases are not expressly overruled, although the ground on which they were placed is swept away by the statement that they must rest on the fact that they were found 'arbitrary in their operation and effect.' * * *

"The case is significant in showing the disposition of the majority of the Court to rely on the cases in which legislative action has been upheld under the due process clause and to derive from them a broad rule of legislative freedom."

In the Nebbia Case, the price fixing feature of the New York statute under attack was upheld, not because the milk industry was affected with a paramount public interest, but it was upheld because it regulated in this regard an industry which is so affected with a public interest as to be subject to legislative control under the police power, and, it being admittedly, subject

to such control, the control could be exercised in part by the fixing of prices.

The law involved in the Nebbia Case is strikingly similar to Act No. 48 of 1936, which is the law involved in this case. As shown by their respective legislative declarations, the object sought to be obtained in both statutes is the protection of the public health and the public welfare and interest.

Act No. 48 of 1936 itself is not unreasonable, arbitrary or capricious, and the fixing in accordance with Section 12 of the statute of such minimum prices as are "just, and under varying conditions, will best protect the public health and safety by affording a sufficient minimum price for barber work to enable the barbers to furnish modern and healthful services and appliances, so as to minimize the danger to the public health" bears a substantial and direct relation to the object of the legislative act.

It is true that in the case of the statute involved in the Nebbia Case, an investigation had been made by the legislature through a commission appointed for the purpose, and the legislative findings were based upon that investigation. No special investigation was made through a commission by the legislature of this state to support its declarations contained in Section 1 of Act No. 48 of 1936, but the act is not invalid for that reason. In the case of Townsend v. Yeomans, 301 U.S. 444, 57 S. Ct. 842, 81 L.Ed. 1210, decided by the Supreme Court of the United States, since its decision in the Nebbia Case, the proposition has been squarely passed upon, as shown by the following quotation from the Townsend Case, viz. (page 847):

"Appellants contend that the legislative action was taken without investigation and hence must be considered to be arbitrary and beyond the legislative power. There is no principle of constitutional law which nullifies action taken by a legislature, otherwise competent, in the absence of a special investigation. The result of particular legislative inquiries through commissions or otherwise may be most helpful in portraying the exigencies to which the legislative action has been addressed and in fortifying conclusions as to reasonableness. Nebbia v. New York, supra, 291 U.S. 502, at page 516, et seq., 54 S.Ct. 505, 507, et seq., 78 L.Ed. 940, 89 A.L.R. 1469. But the Legislature, acting within its sphere, is presumed to know the needs of the people of the state. Whether or not special inquiries should be made is a matter for the legislative discretion."

There is no evidence in the record to refute the legislative finding. The presumption is in favor of the existence of the facts found by the legislature, and the burden was on the dependent to show that the legislative action is unreasonable and arbitrary. Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 55 S.Ct. 187, 79 L. Ed. 281.

In this case not only did the legislature recognize the necessity for the regulation of the minimum prices to be charged by barbers for their services, but also it has exercised its power to establish such regulation in a fair and reasonable manner. The

statute permits the barbers themselves in each judicial district, not by a bare majority, but by a necessary three-fourths of those engaged in the business, to fix the minimum prices for their services. In addition to this, the fixing of these prices must be approved by the State Board of Barber Examiners. Therefore, before any price can be fixed at all, three-fourths of the barbers themselves must agree, and then the Board must approve their agreement.

Another case in point is the case of Max Factor & Co. v. Kunsman, 5 Cal.2d 446, 55 P.2d 177, 178, in which the Supreme Court of California recently upheld the right of the legislature to pass a law allowing the fixing of prices under a code of fair practice. In considering an attack upon the provisions of the statute, the court said, at page 183:

"The fact that a statute limits the rights of the owner of property, lowers its value, or limits its use, or limits the right of free bargaining in other ways, does not, of itself, determine the validity of the enactment.

"There are innumerable illustrations of statutes, passed under the police power, which interfere with the right of free bargaining which have been upheld on the theory the regulation is in the public interest.

"There are limits to this power, of course, but within those limits the Legislature is supreme. * * *

"As the state progresses, the police power, within reason, develops to meet the changing conditions."

And at page 184, the author of the opinion continues:

"The police power is no longer limited to measures designed to protect life, safety, health, and morals of the citizens, but extends to measures designed to promote the public convenience and the general prosperity." Nebbia v. New York, 291 U.S. 502, [54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469]; Munn v. Illinois, 94 U.S. 113 [24 L. Ed. 77].

The evidence produced by defendant in support of his attack on the statutory provision on the ground that it deprives him of the right to earn a living is extremely meagre and wholly unconvincing. Apparently defendant is the only barber within his judicial district who is unable to survive by charging for his services the minimum prices fixed for his district under the authority of the legislative act. No other barber within that district is before the court complaining of those prices. This ground of defendant's attack on the statute overlooks the necessity impelling the legislature to enact it, namely, to enable the barbers to render and maintain reasonably safe and healthful barbering services to the general public as required by the laws of this state. It also overlooks the fact that more than three-fourths of the barbers residing and operating within the same judicial district as the defendant have determined and declared that they can only earn a living and at the same time comply with the regulations established by law if the minimum prices which they have agreed upon, with the approval of the Board of Barber Examiners, are put into effect.

So far as the law is concerned, I think this particular ground of defendant's attack on the statute is controlled by the recent decision of the United States Supreme Court in the case of Hegeman Farms Corporation v. Baldwin, 293 U.S. 163, 55 S.Ct. 7, 79 L.Ed. 259, in which among the legal principles announced are that if the designation of minimum prices is within the scope of the police power, expenses or losses made necessary thereby must be borne by the dealer as an incident, unless the order goes so far beyond the needs of the occasion as to be turned into an act of tyranny, and that the Fourteenth Amendment, U.S.C.A.Const. Amend. 14, does not protect a business against the hazards of competition.

I think, also, that the decision in the case of Allopathic State Board of Medical Examiners v. Fowler, 50 La.Ann. 1358, 24 So. 809, is also controlling of defendant's attack on the statute predicated on the ground that it deprives him of his right to earn a living.

In the Fowler Case, this court held that the right to practice medicine is not an absolute natural right, but a right or privilege to be exercised under conditions and limitations regulated by legislative authority, and that a statute regulating the practice of medicine is not open to attack as depriving citizens of their right to earn a living.

In the Fowler Case, the court said (page 815):

"There can be no question of the right of every citizen to earn a living. Any statute attempting in general terms to prohibit a person from doing so would be utterly null and void. There is a very great difference, however, between so radical and sweeping a prohibition and a prohibition extending either absolutely or conditionally to certain specified pursuits which the legislative branch of the government, as guardians of the public good and general welfare, should declare dangerous to the community, and necessary for that reason to be either entirely suppressed or exercised only under certain circumstances, conditions, and limitations. Article 2626 of the Civil Code declares that: 'The first law of society being that the general interest shall be preferred to that of individuals, every individual who possesses under the protection of the law any particular property is tacitly subjected to the obligation of yielding it to the community whenever it becomes necessary for the general use.' The same principle finds expression in article 491 of the Civil Code, which declares, relatively to the ownership of property, that perfect ownership gives the right to use, to enjoy, and to dispose of one's property in the most unlimited manner, provided it is not used in any way prohibited by law or ordinances. The necessity of subordinating individual rights of one person to the extent necessary for the protection of the rights of others is announced also in articles 666 and 667 of the Civil Code."

In my opinion, the principles announced in the Fowler Case are appropriate to the issues involved in this case.

In my opinion, also, the cases of City of Alexandria v. Hall, 171 La. 595, 131 So. 722, State v. Ives, 123 Fla. 401, 167 So. 394 and City of Mobile v. Rouse, 27 Ala.App.

344, 173 So. 254, are not appropriate to this case.

The distinction between the case of the City of Alexandria v. Hall, supra, and this case is pointed out by Mr. Justice Land in his dissenting opinion and it needs no further comment.

In State v. Ives, supra, the Supreme Court of Florida was closely divided. Three Justices approved the decree, and two Justices dissented. One of the approving Justices, whose vote controlled the decision, concurred on the sole ground that the Florida statute required the State Barber Board to fix the prices generally throughout the State of Florida, or in any county thereof, which he stated was incapable of being put into practical operation. And the main reason for the decision appears to be the limitation which the statute placed on the judicial power so as to deprive the circuit courts of the state of their judicial power under the Florida Constitution.

It is true that in the Rouse Case, which was a decision by the Court of Appeals, and not by the Supreme Court of Alabama, and which was also by a divided court, the majority of the court held that the barber business was not affected with a public interest in such a sense as to justify the regulation of charges for barber work. But that holding was not necessary to the decision; the principal reason for holding the ordinance involved invalid, and the only one necessary for the decision, being that the statute under which the ordinance, resulting in the fixing of minimum prices for barber work in the City of Mobile, was passed authorized such action only in Mobile, that being the only city affected under general language including only cities of not less than 60,000 nor more than 250,000 population.

I fully agree with Mr. Justice Buford of the Florida Supreme Court, when he says in his dissenting opinion in the case of State v. Ives, supra (page 412), that: "I find no reason, either in law or logic, why the Legislature may not protect the earning power of human hands engaged in a service materially affected with public interest, such as that of the barber, with the same sanctity with which it may, and does, protect by fixing rates, the earning power of dollars invested in railroads and other utilities which render service affected with public interest, when it has imposed burdensome legislative regulations on both under its lawful police power solely because of the fact that the field of activity of each is affected with the public interest."

For the reasons stated, I respectfully dissent from the majority opinion and decree in this case.

## On Rehearing.

HIGGINS, Justice.

These two cases presenting a single question of law i. e., whether or not Section 12 of Act No. 48 of 1936, generally known as the Barber Act is constitutional, were consolidated in this Court.

August Guchereau, who resides in the City of New Orleans and operated a barber shop there, was charged with violating Section 12 of Act No. 48 of 1936 for performing barber services at prices less

than the minimum prices fixed by the Board of Barber Examiners, in accordance with the provisions of the above statute. He filed a demurrer to the information on the ground that Section 12 of the Act and the regulations of the Board adopted thereunder were unconstitutional for the following reasons:

(1) That it attempts to fix the price of manual labor contrary to Section 7 of Article 4 of the Constitution of the State of Louisiana of 1921, which provides that "no law shall be passed fixing the price of manual labor."

(2) That it contravenes the provisions of Section 2 of Article 1 of the Constitution of 1921 of the State of Louisiana, which states that "no person shall be deprived of life, liberty or property, except by due process of law"; and the Fourteenth Amendment to the Constitution of the United States, U.S.C.A.Const. Amend. 14, which provides: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The trial judge overruled the demurrer holding that Section 12 of the statute and the regulations of the Board based thereon were constitutional. The accused reserved a bill of exception.

On the trial of the case on the merits, it was shown that the Board of Barber Examiners, in accordance with the provisions of Section 12 of Act No. 48 of 1936,

upon the application of more than 75% of the barbers in the Orleans judicial district, fixed the minimum prices of 15¢ for a shave and 35¢ for a hair cut, and that the defendant, although apprised of the Board's regulations charged less than these minimum prices for that type of barber work. It was admitted that he was a duly licensed and qualified barber, in accordance with the laws of this State and the rules and regulations of the Board of Barber Examiners. It was not charged or proved that his shop was in an unsanitary condition.

The defendant was convicted and sentenced. He appealed.

In the other case, Noah E. Parker, a resident of Bernice, Union Parish, Louisiana, operated a barber shop there. It was shown that he was duly licensed and qualified under the laws of the State and the rules and regulations of the Board of Barber Examiners, and that he complied with the sanitary regulations. It also appears that the Board, upon the application of more than 75% of the barbers in the Third Judicial District, which included Union Parish, adopted minimum prices of 40¢ for a hair cut and 25¢ for a shave, and although Parker was notified by the Board of this regulation and complied with it for a short while he, subsequently, deliberately and intentionally violated its rule by charging 25¢ for a hair cut and 15¢ for a shave. He was notified by the board to desist from this practice but disregarded its admonitions. He was then called before the Board for practicing the barber trade in violation of the Board's rules and regulations, but,

upon the trial failed to appear. The Board then suspended his license for six months and ordered him to discontinue his business. He again disregarded its instructions and the Board, under Section 8 of Act No. 48 of 1936 petitioned the district court for an injunction to restrain the defendant from practicing the barber trade or business. He was also charged in an information with having violated Section 12 of Act No. 48 of 1936 in performing barber services for less than the minimum prices adopted by the Board. In both the injunction or civil suit and the criminal proceeding he pleaded the unconstitutionality of Section 12 of the statute and the regulations adopted thereunder by the Board fixing minimum prices on the same grounds urged by August Guchereau, defendant in the other case.

The injunction matter was tried and the trial judge, holding that Section 12 of the statute was unconstitutional, refused to grant the injunction. The Board appealed.

The criminal prosecution against Parker is still pending in the district court awaiting the final decision of this case.

We held originally that Section 12 of Act No. 48 of 1936 and the regulations of the Board adopted thereunder were unconstitutional, being in violation of the due process clauses of the Federal and State Constitutions. We granted the applications for rehearings and the cases are before us for further consideration.

The title of the statute reads:

"To regulate and control the Barber Industry, and for that purpose to further enlarge the present powers of the Board of Barber Examiners; defining its additional jurisdiction, powers, and duties; to approve agreements from each Judicial District; and providing penalties for violation of this Act."

In Section 1, the Legislators declared:

"Be it enacted by the Legislature of Louisiana, That this Act is enacted in the exercise of the police power of this State and its purposes generally are to protect the public welfare, public health and public safety.

"It is hereby declared that unfair, unjust, destructive, demoralizing and uneconomic trading practices have been and are now being carried on in the operation of barber shops in the State of Louisiana, and that unfair competition exists between the individual barbers of this State to the extent that prices have been reduced by such unfair competition to the point where it is impossible for an average barber, although working regularly, to support and maintain reasonably safe and healthful barbering services to the public.

"That such conditions constitute a menace to the health, welfare and reasonable comfort of the inhabitants of this State, and tend to the transmission of disease.

"That as the barber business affects the health, comfort and well-being of our citizens, and of the public which patronizes the barbers of the State of Louisiana, in order to promote the public welfare, health and safety, and to prevent the transmission of disease, in view of the personal touch and contacts manifested and exercised in

the barber business, and the need for well-nourished, strong and healthy persons to engage in the barber business, the barber profession is hereby declared to be a business affecting the public health, public interest and public safety.

"That the present acute economic condition, being in part the consequence of a severe and increasing disparity between the prices of barber work and other commodities, which disparity has largely destroyed the purchasing power of barbers for industrial and sanitary products so necessary in the operation of their business, has broken down the orderly performing of the duties of the barbering profession and has seriously impaired and injured the public health and safety.

"That the danger to the public health, safety welfare is immediate and impending, the necessity urgent, and such as will not admit of delay in public supervision and control in accord with the proper standards of the barber profession. The foregoing statement of fact, policy and application of this Act are hereby declared as a matter of legislative determination."

Section 4 of the Act expressly declares that the Board of Barber Examiners is the instrumentality of the State to carry out the purposes of the Act.

Section 8 of the statute, in addition to any other remedy, gives the Board authority to apply to a court of competent jurisdiction for relief by injunction. This same section also makes the violation of the provisions of the Act or any rule of the

Board a misdemeanor punishable by fine or imprisonment.

Section 12 provides:

"Order Fixing Prices of Barber Work:

"(a) That the Board shall have the power to approve price agreements establishing minimum prices for barber work, signed, and submitted by any organized groups of at least 75% of the barbers of each Judicial District, after ascertaining by such investigations, and proofs as the condition permits and requires, that such price agreement is just, and under varying conditions, will best protect the public health and safety by affording a sufficient minimum price for barber work to enable the barbers to furnish modern and healthful services and appliances, so as to minimize the danger to the public health incident to such work.

"The Board shall take into consideration all conditions affecting the barber profession in its relation to the public health and safety.

"In determining reasonable minimum prices, the Board shall take into consideration the necessary costs incurred in the particular Judicial District in maintaining a barber shop in a clean, healthful and sanitary condition.

"(b) The Board, after making such investigation, shall fix by official order, the minimum price for all work usually performed in a barber shop.

"(c) That if the Board after investigation, made either upon its own initiative,

'or upon the complaint of a representative group of barbers, determines that the minimum prices so fixed are insufficient to properly provide healthful services to the public and keep the shops sanitary, then the Board from time to time shall have authority to vary or re-fix the minimum prices for a barber's work in each Judicial District."

■ It is not seriously insisted that this is an attempt to fix the price of manual labor for it is well settled by the jurisprudence of this State that the occupation of a barber is classified as a mechanical pursuit and not as manual labor. State ex rel. Grocery Co. v. Land, 108 La. 512, 32 So. 433, 58 L.R.A. 407, 92 Am.St.Rep. 392; Cole v. Grant, 144 La. 916, 81 So. 398; Groves & Rosenblath v. Atkins, 160 La. 489, 490, 107 So. 316; State v. Hirn, 46 La.Ann. 1443, 16 So. 403; State v. Dielenschneider, 44 La.Ann. 1116, 11 So. 823; State v. Cohn, 184 La. 53, 165 So. 449; see also Devney's Case, 223 Mass. 270, 111 N.E. 788.

The second contention is that the provisions of Section 12 of the statute deprive the defendants of their liberty and property, without due process of law, in violation of the above quoted provisions of the State and Federal Constitutions.

■ An Act of the Legislature is presumed to be legal until it is shown that it is manifestly unconstitutional and all doubts as to its validity are resolved in favor of its constitutionality. Becker Steel Co. v. Cummings, 1935, 296 U.S. 74, 56 S.Ct. 15, 80 L.Ed. 54; Alaska Packer's Ass'n v. Industrial Acc. Commission, 1935,

294 U.S. 532, 55 S.Ct. 518, 79 L.Ed. 1044; Borden's Farm Products Co. v. Baldwin, 1934, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281; Life & Cas. Ins. Co. v. McCray, 1934, 291 U.S. 566, 54 S.Ct. 482, 78 L.Ed. 987; New Orleans v. Louis Robira, 1890, 42 La. Ann. 1098, 8 So. 402, 11 L.R.A. 141.

■ The above rule is strictly observed in cases where the Legislature enacted a law in the exercise of its police power. Slaughter House Cases, 1873, 16 Wall. 36, 21 L.Ed. 394; Euclid v. Ambler Realty Co., 1926, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016; Thomas Cusack Co. v. Chicago, 1917, 242 U.S. 526, 37 S.Ct. 190, 61 L.Ed. 472, L.R.A.1918A, 136, Ann. Cas.1917C, 594; Hadacheck v. Sebastian, 1915, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348, Ann.Cas.1917B, 927; Erie R. Co. v. Williams, 1914, 233 U.S. 685, 34 S.Ct. 761, 58 L.Ed. 1155, 51 L.R.A.,N.S., 1097.

■ The Legislature is presumed to have acted only after a thorough investigation and upon finding that the interest of the public required the legislation in question. Durand v. Dyson, 1916, 271 Ill. 382, 111 N.E. 143, Ann.Cas.1917D, 84; Townsend v. Yeomans, 301 U.S. 441, 57 S.Ct. 842, 81 L.Ed. 1210; Max Factor & Co. v. Kunsman, 5 Cal.2d 446, 55 P.2d 177, 178; Borden's Farm Products Co. v. Baldwin, supra.

■ It has been held many times that the Fourteenth Amendment of the Constitution of the United States, U.S.C.A.Const. Amend. 14, and Article 1, Section 2 of the Constitution of Louisiana, prohibiting the deprivation of life, liberty or property without due process of law do not operate

as limitations upon the police power of the State to enact and enforce laws and regulations to protect the public health and safety and promote the general welfare of the people. These constitutional protective inhibitions must of necessity yield to the valid exercise of the police power by the State. Nebbia v. People of New York, 1934, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Pacific Gas & E. Co. v. Police Court, 1919, 251 U.S. 22, 40 S.Ct. 79, 64 L.Ed. 112; Mountain Timber Co. v. Washington, 1917, 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685, Ann.Cas.1917D, 642; Giozza v. Tiernan, 1893, 148 U.S. 657, 13 S.Ct. 721, 37 L.Ed. 599; Mugler v. Kansas, 1887, 123 U.S. 623, 8 S.Ct. 273, 31 L. Ed. 205; New Orleans v. Postek, 1935, 180 La. 1048, 158 So. 553; Lacoste v. Department of Conservation, 1922, 151 La. 909, 92 So. 381, affirmed in 1924, 263 U.S. 545, 44 S.Ct. 186, 68 L.Ed. 437; State v. McCormick, 1918, 142 La. 580, 77 So. 288, L.R.A.1918C, 262; State v. Schlemmer, 1890, 42 La.Ann. 1166, 8 So. 307, 10 L.R.A. 135; Garrett, Blanks, et al. v. Aby, 47 La. Ann. 618, at page 630, 17 So. 238 (Citing Stone v. Mississippi, 101 U.S. 814, 25 L.Ed. 1079 * * * Slaughter House Cases, 16 Wall. 36, 21 L.Ed. 394; Pickles v. Dry Dock Co., 38 La.Ann. 412; Kidd v. Pearson, 128 U.S. 1, 9 S.Ct. 6, 32 L.Ed. 346; Metropolitan Board v. Barrie, 34 N. Y. 657, 662); Allopathic State Board of Medical Examiners v. Fowler, 50 La.Ann. 1358, 24 So. 809; Chicago B. & Q. R. Co. v. McGuire, 219 U.S. 549, 31 S.Ct. 259, 55 L.Ed. 328; State v. Payssan, 47 La.Ann. 1029, 17 So. 481, 49 Am.St.Rep. 390; State v. Morris, 47 La.Ann. 1660, 18 So. 710;

West Coast Hotel Co. v. Parrish, 300 U. S. 379, 57 S.Ct. 578, 81 L.Ed. 703, 108 A. L.R. 1330; Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L. R. 1469; New State Ice Co. v. Liebmann, 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747; Lake Shore & M. S. R. Co. v. Ohio, 173 U.S. 285, 292, 19 S.Ct. 465, 43 L.Ed. 702, 704; Chicago & A. R. Co. v. Tranbarger, 238 U.S. 67, 77, 35 S.Ct. 678, 59 L.Ed. 1204, 1211; Chicago B. & Q. R. Co. v. Illinois, 200 U.S. 561, 592, 26 S.Ct. 341, 50 L.Ed. 596, 609, 4 Ann.Cas. 1175; State v. De Verges, 153 La. 349, 95 So. 805, 27 A.L.R. 1526; Bacon v. Walker, 204 U.S. 311, 317, 27 S.Ct. 289, 51 L.Ed. 499.

Mr. Chief Justice Waite, in the case of Munn v. Illinois, 1876, 94 U.S. 113, 124, 24 L.Ed. 77, 83, put the foregoing fundamental principle of democratic government in the following words:

"When one becomes a member of society, he necessarily parts with some rights or privileges which, as an individual not affected by his relations to others, he might retain. 'A body politic,' as aptly defined in the preamble of the Constitution of Massachusetts, 'is a social compact by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good.' This does not confer power upon the whole people to control rights which are purely and exclusively private, Thorpe v. R. R. Co., 27 Vt. [140] 143 [62 Am.Dec. 625], but it does authorize the establishment of laws requiring each citizen to so conduct himself, and so use his own property as not necessarily to in-

jure another. This is the very essence of government, and has found expression in the maxim, sic utere tuo ut alienum non laedas. From this source come the police powers, which, as was said by Mr. Chief Justice Taney in the License Case, 5 How. [504] 583 [12 L.Ed. 256], 'are nothing more or less than the powers of government inherent in every sovereignty, * * * that is to say, * * * the power to govern men and things.' Under these powers the government regulates the conduct of its citizens one toward another and the manner in which each shall use his own property, when such regulation becomes necessary for the public good."

The operation of a barber shop is a business affecting the public health, safety and welfare and laws and regulations enacted for the purpose of preserving them constitute a valid exercise of the police power of the State, provided such laws and regulations are not arbitrary, capricious and oppressive and that the means selected by the legislative body to carry them out shall have a real and substantial relation to the purpose sought to be obtained. Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, 43 S.Ct. 630, 67 L.Ed. 1103, 27 A.L.R. 1280; New State Ice Co. v. Liebmann, 285 U.S. 262, 52 S.Ct. 371, 76 L.Ed. 747; Bacon v. Walker, 204 U.S. 311, 27 S.Ct. 289, 51 L.Ed. 499; Slaughter House Cases, 16 Wall. 36, 21 L.Ed. 394; and State v. De Verges, 153 La. 349, 95 So. 805, 27 A.L.R. 1526.

It is clear that, as the services of a barber directly affect the human anatomy and, therefore, involve the public health and safety, it is a business affected with the public interest and subject to regulation under the police power of the State. 7 Am. Jurisprudence, 613-615 (1937); Nation v. Chism, 154 Okl. 50, 6 P.2d 766; Peters v. State, 56 Okl.Cr. 95, 34 P.2d 286; Grable v. Childers, 176 Okl. 360, 56 P.2d 357.

The Legislature of the State of Louisiana has passed regulatory statutes, Act No. 247 of 1928, which creates the Board of Barber Examiners, and Act No. 128 of 1932.

However, it is argued that Section 12 of Act No. 48 of 1936 is not a regulatory measure but a price-fixing statute which has no real or substantial relation to the public health, safety and welfare, and is arbitrary, capricious and oppressive.

In the case of Nebbia v. People of State of New York, 291 U.S. 502-559, 54 S.Ct. 505, 506, 78 L.Ed. 940, 89 A.L.R. 1469, we find the following:

"The Legislature of New York established by chapter 158 of the Laws of 1933, a Milk Control Board with power, among other things to 'fix minimum and maximum * * * retail prices to be charged by * * * stores to consumers for consumption off the premises where sold.' * * * The board fixed nine cents as the price to be charged by a store for a quart of milk. Nebbia, the proprietor of a grocery store in Rochester, sold two quarts and a 5 cent loaf of bread for eighteen cents; and was convicted for violating the

board's order. At his trial he asserted the statute and order contravene the equal protection clause and the due process clause of the Fourteenth Amendment, and renewed the contention in successive appeals to the county court and the Court of Appeals. Both overruled his claim and affirmed the conviction.

"The question for decision is whether the Federal Constitution prohibits a state from so fixing the selling price of milk. * * *

"Section 312 (e) on which the prosecution in the present case is founded, provides: 'After the board shall have fixed prices to be charged or paid for milk in any form * * * it shall be unlawful for a milk dealer to sell or buy or offer to sell or buy milk at any price less or more than such price, * * * and no method or device shall be lawful whereby milk is bought or sold * * * at a price less or more than such price * * * whether by any discount, or rebate, or free service, or advertising allowance, or a combined price for such milk together with another commodity or commodities, or service or services, which is less or more than the aggregate of the prices for the milk and the price or prices for such other commodity or commodities, or service or services, when sold or offered for sale separately or otherwise. * * *'

"First. The appellant urges that the order of the Milk Control Board denies him the equal protection of the laws. It is shown that the order requires him, if he purchases his supply from a dealer, to pay 8 cents per quart and 5 cents per pint, and to resell at not less than nine and six, whereas the same dealer may buy his supply from a farmer at lower prices and deliver milk to consumers at 10 cents the quart and 6 cents the pint. We think the contention that the discrimination deprives the appellant of equal protection is not well founded. For aught that appears, the appellant purchased his supply of milk from a farmer as do distributors, or could have procured it from a farmer if he so desired. There is therefore no showing that the order placed him at a disadvantage, or in fact affected him adversely, and this alone is fatal to the claim of denial of equal protection. But if it were shown that the appellant is compelled to buy from a distributor, the difference in the retail price he is required to charge his customers, from that prescribed for sales by distributors is not on its face arbitrary or unreasonable, for there are obvious distinctions between the two sorts of merchants which may well justify a difference of treatment, if the Legislature possesses the power to control the prices to be charged for fluid milk. Compare American Sugar Ref. Co. v. Louisiana, 179 U.S. 89, 21 S.Ct. 43, 45 L.Ed. 102; Brown-Forman Co. v. Kentucky, 217 U.S. 563, 30 S. Ct. 578, 54 L.Ed. 883; State [Board of] Tax Com'rs v. Jackson, 283 U.S. 527, 51 S.Ct. 540, 75 L.Ed. 1248, 73 A.L.R. 1464 [75 A.L.R. 1536].

"Second. The more serious question is whether, in the light of the conditions disclosed, the enforcement of section 312 (e) denied the appellant the due process secured to him by the Fourteenth Amendment.

"Save the conduct of railroads, no business has been so thoroughly regimented and regulated by the State of New York as the milk industry. Legislation controlling it in the interest of the public health was adopted in 1862 and subsequent statutes, have been carried into the general codification known as the Agriculture and Markets Law. A perusal of these statutes discloses that the milk industry has been progressively subjected to a larger measure of control. * * * Proprietors of milk gathering stations or processing plants are subject to regulation (section 54), and persons in charge must operate under license and give bond to comply with the law and regulations; must keep records, pay promptly for milk purchased, abstain from false or misleading statements and from combinations to fix prices (sections 57, 57-a, 252). In addition there is a large volume of legislation intended to promote cleanliness and fair trade practices, affecting all who are engaged in the industry. The challenged amendment of 1933 carried regulation much farther than the prior enactments. Appellant insists that it went beyond the limits fixed by the Constitution. Under our form of government the use of property and the making of contracts are normally matters of private and not of public concern. The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest. * * *

"Thus has this court from the early days affirmed that the power to promote the general welfare is inherent in government.

"* * * And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. * * *

"The court has repeatedly sustained curtailment of enjoyment of private property, in the public interest. The owner's rights may be subordinated to the needs of other private owners whose pursuits are vital to the paramount interests of the community. * * *

"The Constitution does not guarantee the unrestricted privilege to engage in a business or to conduct it as one pleases. * * *

"Legislation concerning sales of goods, and incidentally affecting prices, has repeatedly been held valid. In this class fall laws forbidding unfair competition by the charging of lower prices in one locality than those exacted in another, by giving trade inducements to purchasers, and by other forms of price discrimination. The public policy with respect to free competition has engendered state and federal statutes prohibiting monopolies, which have been upheld. On the other hand, where the policy of the state dictated that a monopoly should be granted, statutes

having that effect have been held inoffensive to the constitutional guarantees. Moreover, the state or a municipality may itself enter into business in competition with private proprietors, and thus effectively although indirectly control the prices charged by them.

"The milk industry in New York has been the subject of long-standing and drastic regulation in the public interest. The legislative investigation of 1932 was persuasive of the fact that for this and other reasons unrestricted competition aggravated existing evils and the normal law of supply and demand was insufficient to correct maladjustments detrimental to the community. The inquiry disclosed destructive and demoralizing competitive conditions and unfair trade practices which resulted in retail price cutting and reduced the income of the farmer below the cost of production. We do not understand the appellant to deny that in these circumstances the Legislature might reasonably consider further regulation and control desirable for protection of the industry and the consuming public. That body believed conditions could be improved by preventing destructive price-cutting by stores which, due to the flood of surplus milk, were able to buy at much lower prices than the larger distributors and to sell without incurring the delivery costs of the latter. In the order of which complaint is made the Milk Control Board fixed a price of 10 cents per quart for sales by a distributor to a consumer, and 9 cents by a store to a consumer, thus recognizing the lower costs of the store, and endeavoring to establish a differential which would

be just to both. In the light of the facts the order appears not to be unreasonable or arbitrary, or without relation to the purpose to prevent ruthless competition from destroying the wholesale price structure on which the farmer depends for his livelihood, and the community for an assured supply of milk.

"But we are told that because the law essays to control prices it denies due process. Notwithstanding the admitted power to correct existing economic ills by appropriate regulation of business, even though an indirect result may be a restriction of the freedom of contract or a modification of charges for services or the price of commodities, the appellant urges that direct fixation of prices is a type of regulation absolutely forbidden. His position is that the Fourteenth Amendment requires us to hold the challenged statute void for this reason alone. The argument runs that the public control of rates or prices is per se unreasonable and unconstitutional, save as applied to businesses affected with a public interest; that a business so affected is one in which property is devoted to an enterprise of a sort which the public itself might appropriately undertake, or one whose owner relies on a public grant or franchise for the right to conduct the business, or in which he is bound to serve all who apply; in short, such as is commonly called a public utility; or a business in its nature a monopoly. The milk industry, it is said, possesses none of these characteristics, and, therefore, not being affected with a public interest, its charges may not be controlled by the state. Upon the soundness

of this contention the appellant's case against the statute depends.

"We may as well say at once that the dairy industry is not, in the accepted sense of the phrase, a public utility. We think the appellant is also right in asserting that there is in this case no suggestion of any monopoly or monopolistic practice. It goes without saying that those engaged in the business are in no way dependent upon public grants or franchises for the privilege of conducting their activities. But if, as must be conceded, the industry is subject to regulation in the public interest, what constitutional principle bars the state from correcting existing maladjustments by legislation touching prices? We think there is no such principle. The due process clause makes no mention of sales or of prices any more than it speaks of business or contracts or buildings or other incidents of property. The thought seems nevertheless to have persisted that there is something peculiarly sacrosanct about the price one may charge for what he makes or sells, and that, however able to regulate other elements of manufacture or trade, with incidental effect upon price, the state is incapable of directly controlling the price itself. This view was negatived many years ago. Munn v. Illinois, 94 U.S. 113, 24 L. Ed. 77.

\* \* \* \* \* \* \* \* \*

"In German Alliance Ins. Co. v. Lewis, 233 U.S. 389, 34 S.Ct. 612, 58 L.Ed. 1011, L.R.A.1915C, 1189, a statute fixing the amount of premiums for fire insurance was held not to deny due process. Though the business of the insurers depended on no franchise or grant from the state, and there was no threat of monopoly, two factors rendered the regulation reasonable. These were the almost universal need of insurance protection and the fact that while the insurers competed for the business, they all fixed their premiums for similar risks according to an agreed schedule of rates. The court was at pains to point out that it was impossible to lay down any sweeping and general classification of businesses as to which price-regulation could be adjudged arbitrary or the reverse.

"Many other decisions show that the private character of a business does not necessarily remove it from the realm of regulation of charges or prices. The usury laws fix the price which may be exacted for the use of money, although no business more essentially private in character can be imagined than that of loaning one's personal funds. Griffith v. Connecticut, 218 U. S. 563, 31 S.Ct. 132, 54 L.Ed. 1151. Insurance agents' compensation may be regulated, though their contracts are private, because the business of insurance is considered one properly subject to public control. O'Gorman & Young v. Hartford F. Ins. Co., 282 U.S. 251, 51 S.Ct. 130, 75 L.Ed. 324, 72 A.L.R. 1163.

\* \* \* \* \* \* \* \* \*

"It is clear that there is no closed class or category of businesses affected with a public interest, and the function of courts in the application of the Fifth and Fourteenth Amendments is to determine in each case whether circumstances vindicate the challenged regulation as a reasonable exertion of governmental authority or condemn

it as arbitrary or discriminatory. Chas. Wolff Packing Co. v. Court of Industrial Relations, 262 U.S. 522, 535, 43 S.Ct. 630, 67 L.Ed. 1103, 1108, 27 A.L.R. 1280. The phrase 'affected with a public interest' can, in the nature of things, mean no more than that an industry for adequate reason, is subject to control for the public good. In several of the decisions of this court wherein the expressions 'affected with a public interest,' and 'clothed with a public use,' have been, brought forward as the criteria of the validity of price control, it has been admitted that they are not susceptible of definition and form an unsatisfactory test of the constitutionality of legislation directed at business practices or prices. These decisions must rest, finally, upon the basis that the requirements of due process were not met because the laws were found arbitrary in their operation and effect. But there can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells.

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the require-ments of due process are satisfied, and judicial determination to that effect renders a court functus officio. 'Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' Northern Securities Co. v. United States, 193 U.S. 197, 337, 338, 24 S.Ct. 436, 48 L.Ed. 679, 700, 701. And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. * * * Times without number we have said that the Legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power. * * *

" * * * Where the public interest was deemed to require the fixing of minimum prices, that expedient has been sustained. If the lawmaking body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted

fixes prices reasonably deemed by the Legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to any one liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty.

" '* * * The established doctrine is that this liberty may not be interfered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect.' "

* * * * * * * * *

"But plainly, I think, this Court must have regard to the wisdom of the enactment. At least, we must inquire concerning its purpose and decide whether the means proposed have reasonable relation to something within legislative power—whether the end is legitimate, and the means appropriate."

The Court concluded that the statute and regulations were constitutional and affirmed the judgment.

In Highland Farms Dairy v. Agnew, 300 U.S. 608, 57 S.Ct. 549, 551, 81 L.Ed. 835, the Court said:—

"The power of a state to fix a minimum price for milk in order to save producers, and with them the consuming public, from price cutting so destructive as to endanger the supply, was affirmed by this Court in Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469, and in other cases afterwards. Hegeman Farms Corp. v. Baldwin, 293 U.S. 163, 55 S.Ct. 7, 79 L.Ed. 259; Borden's Farm Products Co. v. Ten Eyck, 297 U.S. 251, 56 S.Ct. 453, 80 L.Ed. 669. Appellants are not asking us to undo what was there done. They take the ground, however, that the statute of Virginia is open to objections that were inapplicable to the statute of New York. The present grounds of criticism will be considered one by one.

"1. The statute is not invalid as an unlawful delegation of legislative power.

"The General Assembly of the Commonwealth in setting up the Milk Commission did not charge it with a duty to prescribe a scale of prices in every portion of the state.

"The commission was to establish market areas, and with reference to each area was to determine, after a public hearing, whether there was need within such area that prices should be regulated. If it was satisfied of the need, it was to fix a scale accordingly. The argument for the appellants is that in this there was a grant

of discretionary power overpassing the limits of lawful· delegation.

"The Constitution of the United States in the circumstances here exhibited has no voice upon the subject. The statute challenged as invalid is one adopted by a state. This removes objections that might be worthy of consideration if we were dealing with an act of Congress. How power shall be distributed by a state among its governmental organs is commonly, if not always, a question for the state itself. Nothing in the distribution ˙here attempted supplies the basis for an exception. The statute is not a denial of a republican form of government. Constitution, art. 4, § 4. * * *"

In the case of Townsend v. Yeomans, 1937, 301 U.S. 441, 57 S.Ct. 842, 81 L.Ed. 1353, the Court held that a Georgia statute fixing minimum charges to be made by tobacco warehouses was a valid exercise of the police power of the State, because the tobacco business was affected with a public interest and, therefore, subject to reasonable regulations.

▮▮ Is the statute and regulations in question an arbitrary exercise of the police power by the Legislature and the Board of Barber Examiners?

Section 1 of the Act clearly states the necessity for further regulation of the barber business. Apparently, the members of the Legislature gained their information from the barber organizations and the State Board of Health and such other sources as they considered reliable, before passing the statute. No attempt was made

to contradict or disapprove the facts given by the Legislature as the reason for its action. In the absence of any evidence contradicting the legislative determination, the presumption is that its declarations are correct and accurate. Townsend v. Yeomans, supra.

▮▮ Can it be said that the method of fixing the minimum prices as provided for in the statute is unreasonable, capricious and arbitrary?

Section 12 of the statute requires a seventy-five per cent. of the barbers of a judicial district to agree on the minimum prices that they propose for the adoption by the Board. The Board of Barber Examiners is not required to accept these suggested prices and may conduct investigations and call for additional information in order to determine to their satisfaction what would be fair and reasonable minimum prices to be charged. The Board thereby protects the minority of the barbers who have not signed the proposed minimum price schedule, as well as the public from any oppressive and arbitrary prices.

▮▮ Is there a real and substantial relation between the minimum price regulations and the sanitation and hygiene standards required of barbers practicing their calling under the laws and regulations of the Board in the interest of public health and safety?

The barbers and the members of the Board of Barber Examiners are familiar with and know the requirements of the sanitation laws and regulations. They are

in a position to fairly, reasonably and accurately determine what should be the minimum prices charged for the respective services rendered by the average barber to members of the public in order to maintain those standards of hygiene and sanitation in the interest of the public health and safety. As we have already seen, the provisions of the statute require 75% of the barbers in a judicial district to agree on the proposed minimum price schedule, which is then subject to revision, rejection or adoption by the members of the Board, who must approve the minimum prices in order to give the regulation legal effect.

 In the Orleans Judicial District the price for a shave was fixed at 15¢ and a hair cut at 35¢, and in the Third Judicial District the price was fixed at 25¢ for a shave and 40¢ for a hair cut. These are the only prices in the minimum price schedule involved here. It was the violation of this part of the regulation that precipitated this litigation. There is nothing in the record to show that the minimum prices adopted are arbitrary, unreasonable, capricious or oppressive and that they do not bear substantial and real relation to the standards exacted by the Board's regulations in order to protect the public health and safety.

The statement by the defendant, Noah Parker, that he was unable to make a living when he charged the minimum prices fixed by the Board, but was able to earn between $175.00 and $200.00 per month when he charged prices below those fixed by the Board is not sufficient to overcome the prima facie case established by the State as a result of the actions of the members of the Legislature in enacting the law, 75% of the barbers in the Third Judicial District in proposing the schedule and the Board in establishing the minimum prices after investigations. It may well be that Parker's receipts increased when he cut prices, for, the very purpose of doing that was to gain more patrons. This is particularly true when at least 75% of the other barbers of that district were adhering to the minimum price schedule. In fact, it was not shown that any other barber in that district except the defendant Parker was charging less than the regulation required. So, the single instance wherein one barber was benefitted is insufficient to overcome the experiences of the others in that district to justify the court in concluding that the minimum prices fixed were an arbitrary and unwarranted exercise of the police power of the State.

In Section 1 of the Act, the Legislature expressly declares that unfair price competition exists among the barbers of the State to such a degree in their respective localities that it is impossible for the average barber to comply with reasonable health regulations in rendering their services to the public and earn a living.

In the case of Nebbia v. People of State of New York, supra, the United States Supreme Court held that where minimum price regulations are reasonable and designed for the purpose of protecting the public health against the harmful and dangerous effects of drastic price com-

petition, the regulations were a valid exercise of the police power of the State and not violative of the due process clause of the Constitution.

 The contention that the provisions of the statute and regulations deprived the defendants of their constitutional right to earn a living is answered in Allopathic State Board of Medical Examiners v. Fowler, 50 La.Ann. 1358, 24 So. 809, and Hegeman Farms Corpn. v. Baldwin, 293 U.S. 163, 55 S.Ct. 7, 79 L.Ed. 259.

The cases of State ex rel. Fulton v. Ives et al., 1936, 123 Fla. 401, 167 So. 394; Duncan v. City of Des Moines, 1936, 222 Iowa 218, 268 N.W. 547; and City of Mobile v. Rouse, 1937, 27 Ala.App. 344, 173 So. 254, are not controlling because these decisions were rested mainly upon the opinion of the United States Supreme Court in the case of Adkins v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785, 24 A.L.R. 1238, and that authority was expressly overruled by the U. S. Supreme Court in the recent case of West Coast Hotel Company v. Ernest Parrish et ux., 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 707, 108 A.L.R. 1330, decided March 29, 1937. The Ives Case is distinguishable because the Court found the statute to be arbitrary in applying to the State as a whole when conditions in various localities were different. The City of Mobile Case is not apposite because the provisions of the statute in question confined its operation to the City of Mobile.

The case of the City of Alexandria v. Hall, 171 La. 595, 131 So. 722, is not in point, because the Court found from the evidence that the City ordinance was based upon conjecture and had no real or substantial relation to the purpose sought to be accomplished by the ordinance.

In the Adkins Case, supra, the United States Supreme Court held unconstitutional an act of Congress which authorized a designated board in the District of Columbia to fix a minimum wage for women and children to supply the necessary costs of living, etc.

In the case of West Coast Hotel Co. v. Ernest Parrish et ux., supra, the same Court held that the minimum wage law for minors and women of the State of Washington was valid and did not violate the due process clause of the Constitution and expressly overruled the Adkins Case.

The Court of last resort of the Nation having held that a price fixing statute or regulation enacted by the legislative department of a sovereign State under its police power concerning a business or trade affected with a public interest and having real and substantial relation to the public welfare, health and safety does not violate the due process clause of the Federal Constitution, and, the provisions of our own Constitution being identical with those of the Fourteenth Amendment, we consider the question settled, although the opinions of the United States Supreme Court were not unanimous. A reading of the decisions of that august tribunal on this highly controversial subject leads one to conclude that the last view is more liberal in interpreting the due process clause as affecting the authority of the legislative department under its police power.

■ It is obvious that the statute and regulations in question do not deny equal protection of the law to the defendants for it applies alike to all parties similarly situated.

■ For the reasons assigned our original opinion and decree are set aside and recalled and it is now ordered, adjudged and decreed that the provisions of Section 12 of Act No. 48 of the Legislature of 1936 and the minimum price fixing regulations of the Board of Barber Examiners adopted thereunder are held to be constitutional and not violative of the due process clauses of the Federal and State Constitutions.

It is further ordered, adjudged and decreed that the conviction and sentence of the defendant, August Guchereau, in proceedings No. 34,713, 182 So. 515, are affirmed.

It is further ordered, adjudged and decreed that the judgment of the district court in proceedings No. 34,517, denying the Board of Barber Examiners of Louisiana an injunction against Noah E. Parker is annulled and set aside, and

It is now ordered, adjudged and decreed that an injunction issue restraining, enjoining and prohibiting the defendant, Noah E. Parker, from practicing the trade of a barber or operating a barber shop in the Third Judicial District and performing or rendering barber services or work at prices less than those fixed by the Board of Barber Examiners as authorized by Section 12 of Act No. 48 of 1936; defendant Parker to pay all costs of court in his case.

Defendant's rights to a rehearing reserved.

ODOM, J., dissents and adheres to his original opinion.

O'NIELL, Chief Justice (dissenting on rehearing).

The only question in these cases is whether a statute authorizing a public board to fix the minimum fees that a barber may charge for his services really tends to protect the public health. It is not disputed that the barbers' trade is one which may endanger the public health, and which is therefore subject to regulation by the Legislature. But I do not see how an act of the Legislature prescribing the minimum fees,—or delegating to a public board the authority to prescribe the minimum fees,—that a barber may charge for his services can protect, or have a tendency to protect, the public health. The only appropriate way in which the Legislature can protect the public health, or promote the public welfare, in that respect, is to establish sanitary requirements and regulations, to maintain cleanliness in the barber shops, and to guard against unhealthy barbers, to prescribe qualifications and standards of efficiency, and to enforce them by means of examinations, or by requiring terms of apprenticeship. If a barber complies with all of the requirements of efficiency, and all of the sanitary regulations, as laid down by the Board of

Health or by the Board of Barber Examiners, it cannot possibly endanger the public health or the public welfare for the barber doing business in a sparsely populated locality,—or depending upon a poor class of patrons,—to charge lower rates for his services than the proprietors of the de luxe barber shops, in the big hotels or in the rich business centres, charge for the services rendered there. The proprietors of the barber shops in the large hotels, or in the big business centres, pay more rent, have more costly equipment, and are under heavier overhead expense, than the barbers who do business in the sparsely populated communities, or whose patrons have to consider the matter of economy. A statute that forbids a distinction in that respect tends to do injustice,—not only by depriving the barbers in the poor communities of their livelihood, but also by depriving the poor communities of the services of a barber.

By the 12th section of Act No. 48 of 1936, the Board of Barber Examiners is authorized, on the request of any organized group of seventy-five per cent or more of the barbers in any judicial district in the state, to fix the minimum prices that a barber in that judicial district may charge for his services. In the 8th section of the act, it is made a misdemeanor for a barber to violate such an order of the Board of Barber Examiners, by charging any customer less than the price fixed by the board, for a haircut, shave, massage, shampoo, or other such service. The penalty which the statute imposes upon a barber who charges less for his services than the minimum rate fixed by the Board of Barber Examiners is a fine not less than $25 or more than $300, or imprisonment for a term not exceeding six months, or both the fine and imprisonment, in the discretion of the judge. The statute declares also that each and every day during which a barber violates such an order shall be a separate violation. In addition to this penalty, the statute authorizes the board to proceed by injunction against the barber accused of violating an order of the board; and the board is authorized to revoke the barber's license if the board, after hearing the complaint, is satisfied that the accused barber has violated an order of the board.

In one of the cases before us the Board of Barber Examiners fixed the minimum price for a shave at 15¢ and the minimum price for a haircut at 35¢, in the judicial district comprising only the Parish of Orleans. The defendant, August Guchereau, violated the order of the board by charging less than the prescribed fees for his services, and he was prosecuted for the offense. He was convicted and sentenced to pay a fine of $301.00, or to be confined in the parish prison for seven months. He is appealing from the conviction and sentence.

In the other case before us, the board fixed the minimum prices at 40¢ for a haircut and 25¢ for a shave, throughout the Third Judicial District, which is composed of the parishes of Lincoln and Union, and embraces the cities of Ruston and Farmerville. The district measures forty miles each way, and has 43,553 in-

habitants. The defendant, Noah E. Parker, having a barber shop in Bernice, in Union Parish, violated the order of the Board of Barber Examiners, by charging less than 40¢ for a haircut and less than 25¢ for a shave. His offense was reported to the Board of Barber Examiners, and, after a hearing, the board suspended his license for six months, and ordered him to cease doing business; after which the board proceeded against him by injunction. He was also prosecuted criminally for violating the order of the board. In the injunction suit the judge decided that the statute was unconstitutional; hence the judge dismissed the suit of the Board of Barber Examiners. The board is appealing from the decision. The criminal prosecution is pending yet in the district court, awaiting the outcome of this appeal.

It is admitted in each of these cases that the defendant is a regularly licensed and duly qualified barber, under the laws of the state and under the rules and regulations of the Board of Barber Examiners. It is not contended in either of the cases' that the defendant's barber shop or the method of conducting his business was unsanitary, or that he was not living up to the requirements of the law and of the board in every respect, except in respect of the prices which he charged for his services.

The minimum prices fixed by the board for the barbers in the city of New Orleans, —35¢ for a haircut and 15¢ for a shave,— seem low enough for any locality in the city limits. But it is not so certain that the minimum rates fixed by the board for the barbers in the Third Judicial District,—40¢ for a haircut and 25¢ for a shave,—are low enough for the rural sections in that vast district. The only reason for this discrimination between the New Orleans District and the Third Judicial District, as I understand, is that the voice of a majority of 75 per cent or more of the barbers in each district prevailed. The hardship—and unjust discrimination— that results from such legislation as this, is in compelling the barbers in the sparsely populated outskirts of a city, or in the poorer localities in the city, to charge as high a price for a haircut or a shave as the barbers can charge successfully in the de luxe shops, in the big hotels and in the big business centres of the city. There is hardship and unjust discrimination also in compelling the barbers in the sparsely populated rural sections of a judicial district to charge the same price for a haircut or a shave that the barbers in the large towns and cities in the judicial district can charge successfully for their services. So long as a barber in a sparsely populated rural district, or in the outskirts of a large city, or in any neighborhood of poor people, complies with all of the sanitary rules and regulations laid down by the Board of Health or by the Board of Barber Examiners, there is no good reason why he should be compelled to close his shop and go out of business,—and perhaps be fined and sent to jail,—merely because his customers are unable or unwilling to pay the same price for a haircut or a shave that the barbers in the big hotels and business centres in a city may charge successfully for their services.

The evidence in this case shows that, if the defendant, Noah E. Parker, is forbidden to charge his customers less than 40¢ for a haircut or less than 25¢ for a shave, he must go out of business. That is an interference with his liberty and freedom, and with the liberty and freedom of his patrons, to enter into contracts which do not concern anybody but themselves. We must bear in mind that personal liberty ends only where the rights of others begin. The "liberty" referred to in the Fourteenth Amendment of the Constitution of the United States does not mean merely the right of a citizen to be at liberty in the sense of being not imprisoned. It means the right of a citizen to be free in the enjoyment of his faculties, to be at liberty to use them in any lawful way, and to earn his livelihood by any lawful calling or occupation. It was so said by the Supreme Court of the United States in the case of Allgeyer v. State of Louisiana, 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832. In that case the Supreme Court of the United States said that to deprive a person of his right to pursue his chosen calling, deprived him of his liberty, and that to prevent him from continuing in a lawful business or pursuit, in which he was already engaged, deprived him of his property, in the meaning of the Fourteenth Amendment, U.S.C.A.Const. Amend. 14. On that subject see Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937, 3 Ann.Cas. 1133.

I do not consider the decision rendered by the Supreme Court of the United States in the case of Nebbia v. New York, which is quoted so abundantly in the prevailing opinion in this case, as being appropriate to this case. In the Nebbia Case the court held that a New York statute fixing the retail price of milk was not violative of the Fourteenth Amendment. But the reason for the decision was said to be that the price-cutting by the competitors in the milk business was producing waste, harmful to the public, was threatening ultimately to cut off the supply of milk, and to destroy the industry itself, and thus to affect most disastrously the public welfare. There is nothing like that in this case. The profuse protestations on that subject, in the preamble or first section of this statute,—which is quoted at length in the prevailing opinion in this case, —demonstrate to my mind that the author of the statute realized how hard it would be to convince the courts that the real purpose of the statute was to protect the public health or promote the general welfare. And so I say, with great respect, that the preamble, or first section, of this statute, "doth protest too much, methinks." The courts are not bound by an announcement made by the Legislature, of the necessity or the purpose or effect of a statute that is enacted ostensibly to protect the public health, or to promote the public welfare in any particular respect. On the contrary, in the prevailing opinion in this case, a Justice of the Supreme Court of the United States is quoted as authority for the proposition that the courts must consider the question of wisdom of a statute that is enacted ostensibly to protect the public health or to promote the public welfare in any particular, because the courts must inquire into and decide the question whether the means adopted by the Legislature is really appropriate to the

avowed purpose to be accomplished by the statute.

In the case of the City of Alexandria v. Hall, 171 La. 595, 131 So. 722, an ordinance which required all barber shops to be closed not later than 6:30 p. m. except on Saturdays and on days preceding legal holidays, was declared unconstitutional, as an unwarranted interference with personal liberty,—notwithstanding the avowed purpose of the ordinance was to protect the public health, —and notwithstanding the city introduced medical expert testimony to prove that long working-hours caused barbers to become run-down in health, and susceptible to communicable diseases. In deciding the case, the court cited similar decisions rendered in other jurisdictions, viz.: Ex parte Jentzsch, 112 Cal. 468, 44 P. 803, 32 L.R.A. 664; Chaires v. City of Atlanta, 164 Ga. 755, 139 S.E. 559, 55 A.L.R. 230; State v. City of Laramie, 40 Wyo. 74, 275 P. 106. To this list of decisions are added now the following which are directly in point, viz.: State ex rel. Fulton v. Ives et al., 123 Fla. 401, 167 So. 394, decided in 1936; Duncan v. City of Des Moines, 222 Iowa, 218, 268 N.W. 547, decided in 1936; and City of Mobile v. Rouse, 233 Ala. 622, 173 So. 266, 111 A.L.R. 349, decided in 1937.

The case of Townsend v. Yeomans, 301 U.S. 441, 57 S.Ct. 842, 81 L.Ed. 1210, cited in the prevailing opinion in this case, was decided on a principle that is not at all applicable to this case. The statute of Georgia, which was upheld in that case, fixed the maximum rates which the public warehousemen might charge for handling tobacco. Whether the Legislature may fix the maximum rates which the barbers may charge for their services is a question that is not presented in this case.

I am not lacking in sympathy or consideration for the barbers in these hard times. I patronize one or another of the high-class barber shops every day, except Sundays. I never use a safety razor. But I cannot reconcile my mind to the proposition that a barber should be fined, or sent to jail, or suffer a forfeiture of his livelihood, for no other offense than that of charging less for his services than seventy-five per cent or more of the barbers in his judicial district think he ought to charge.